Good afternoon, everyone. It's a matter of U.S. v. Weinstein. Mr. Urowitz, are you ready to proceed? May it please the Court. Good afternoon, Your Honors. Stephen Urowitz on behalf of Eliyahu Weinstein. Weinstein agrees with the government that a plea is a serious insolemnact, and the Court must keep in mind the Supreme Court's admonition against degrading the plea process. If everything you allege with regard to Judge Pisano is true, what does that get you? From what the briefs can say, basically Judge Pisano said, look, if your guy pleads guilty and pays a restitution, I will take that into consideration. Isn't everybody in the criminal justice system, don't they go into it with an understanding, from defendants on up, that if you plead guilty, you get cut a break, as opposed to going to trial and, quote, not showing remorse? I'm not suggesting that's appropriate or it's right, but that's clearly the rules of the game, isn't it? Everybody knows that. The problem is, in this case, first of all, he said more than that. Well, what did he say that's different than basically, plead guilty and I'll take that into consideration? That famous Philadelphia word, consideration. What he said was, if you plead guilty, all doors will be open. If you go to trial, all doors will be closed. Well, that's a hearsay statement in your materials, right? The only direct quote you have from the judge comes by way of Mr. Cleary's affidavit, correct? And that wasn't even signed, was it? That was not signed, but Mr. Harris, who also was at the Pascoe firm, supplemented that affirmation. And what was told to, certainly to Weinstein, was the statement that the judge said, all doors will be open, all doors will be closed. So, I think there's a good basis. So, what are you looking for, though? Are you looking for a withdrawal of the guilty plea and go to trial? Is that what you're looking for? Wouldn't that be the appropriate remedy? We're looking for a withdrawal of the plea. We're not just going to trial. We would go to trial if necessary. If not, we would try to get a better plea. But, yes, necessary. My guess is if you got a better plea in a year, two years, whatever, maybe not the same assemblage of judges, but somebody would be back here hearing the same kind of argument if your client is not happy with the sentence that comes out of it. It almost sounds like on this one there was buyer's remorse. I think what happened is he accepted a plea. What we have here is a pattern. We have an offer by the government for a plea. A very generous offer the first time. Which was not accepted. Which was not accepted. Then the judge intervenes, and then it gets accepted. The same pattern repeats itself. There's an offer by the government. It's rejected by the client. The judge intervenes, and the client accepts it. So that's the pattern, and that's why it's not simply, yes, a judge, he may be stating the obvious, but when it comes from the judge, that's what the purpose of the election. So is the conduct of the judge you're alleging as egregious as the conduct of the magistrate judge in the Davila decision? I'm sorry? Is the conduct that you're attributing to Judge Pisano, is it even in the same ballpark as the conduct that was discussed in the Davila decision? Where there was discussions about having to go to the cross, so to speak? I think this is worse than the Davila. It is worse? It's worse in Davila because, first of all, the timing is problematic. When you focus on when the statements were made in connection with the plea, that's what makes it worse. It happens almost immediately. There's a conversation with the judge, and the next thing we turn around, Weinstein is agreeing to plead guilty. The same thing happened earlier after the December 3rd conference. They meet with the judge. Weinstein agrees the next day to accept the plea agreement. So that's why I think it's problematic. What about the colloquy? You go through a whole set of questions at a sentencing, and, you know, are you making this plea voluntarily? You know, we could go on and on. He said all the right things. I know, and that's why the Fourth Circuit in Sanya said, when we're dealing with a claim of coercion by the judge, you can't expect. Where's the coercion by the judge of Mr. Weinstein? The coercion is based on the statements that if you take the deal, don't worry, it will come out good with you. If you want the five to ten-year deal. He didn't say it will come out good with you. All doors will be open. I mean, what happened at the colloquy was, I mean, it looked like there was not an agreement to make complete restitution or there was some thoughts of evasion, and the judge sort of unloaded at the sentencing on Mr. Weinstein. For not making, well, that goes into the point about the breach as to why he was unable to make restitution, why he wasn't able to give a deposition. I think that's why the judge really went off on him. But that goes to the breach of the plea argument. Wasn't this a below-guideline sentence? It was. So there was a downward variance in this case. Yes. So all doors were open. He didn't like what the number, but it was a downward variance from the guidelines, right? There was a downward variance, but as typical in most white-collar cases where the guidelines are off the charts, it's not unusual for there to be a downward variance in such a case. So the fact that there was a downward variance, I don't think that's unusual at all. I think what was unusual was the nature of the plea that Weinstein agreed to, except a zero to 25. That's really, he agreed to a guideline plea. He got nothing. The only reason why a defendant would reasonably think that is because he understands that the judge has said, go along with it and you won't get hurt. That's really what happened. So what does that mean, you won't get hurt? You get a probationary sentence? Not a probationary sentence, but more in line with the five-to-ten-year deal that you tried, that was discussed December 3rd. That was rejected by your client. It was rejected and then accepted after the judge said. He accepted with modifications. And then the government didn't accept that, and then ultimately the government gave him two additional options. So it was a whole new opening of negotiation. Well, first of all, I think it's significant that he didn't take a far more, even leaner, after the government rejected, the government didn't reject it because of the modifications, because these were all, as described, minor modifications that the government didn't have a problem with. The government rejected it because of the timing. Now, fast forward two weeks later, the government makes a renewed offer, which two alternative, please, zero to 20, I believe 10 to 15. Weinstein rejected. It's actually more nuanced than that. On December 5th, 2012, Mr. Weinstein tried to accept the expired offer, but with changes. And the government says, no, no, that's not it. You made a counteroffer and we're not accepting your counteroffer, classic contract. And then only on December 13th, the government come out with its, you've got two options. You can go either zero to 20 years imprisonment or 10 to 15 years, depending on the restitution of the account. Right? Right. So as to the first one of those, the December 5th acceptance, the reason why that was accepted was because they had a conversation with the judge the day before on December 3rd. Now, because it's December 13th, the government says you were too late. Well, but if that was the case and you were right, then on December 5th it would be I accept. Not I accept with different conditions. I think that the conditions were, they were not, I'm not sure of the record, but there was an email that said these are minor modifications. These were not a deal breaker. The reason why it was rejected. But the date was changed, though, wasn't it? The date was changed. The date for which the government would not bring additional charges. But the government had agreed to that previously. Well, let me ask you about your claims of this conflict of interest. Wouldn't a better vehicle to deal with that be a habeas? I think in the typical case maybe, but in this case where there is such a record already, we've substantiated. What record? Give a few affidavits. I know. Is that the sort of record you can do a habeas hearing on? I think that there should have been a hearing, but there was enough to prompt the judge for a hearing. Assuming that it's true in terms of the conflict of interest, the government in very rare cases, I'm not sure I've seen this before, has basically come forward and said that the deal that was at issue was not improper and that they were stipulating that Harris's conduct, his presence at that deal, and telling Rottenstein and Rottenstein that this deal was legit, they stipulated the fact that it was legit. But where was the conflict? Actually, Judge McGee, at JA-79, which is the indictment, the indictment alleges these new deals, too, were fraudulent. So the government's after-the-fact statement that these deals were all legitimate is inconsistent with the indictment. Well, it's fraudulent because the money that was paid didn't go to the insurance. It went to your client's pocket, according to the code. The problem was what happened with the money. Most respectfully, that's not what the indictment says. But moreover, the only way it was able to go to Weinstein's pocket or to go to someone else was because Harris had assured Rottenstein, don't worry, Weinstein's only a consultant in this matter. You don't have to worry about it. He's on the side. Had he not made that representation, Rottenstein told the government he wouldn't have invested in the deal. I'm confused with that because the investment in the deal as described, I thought, was okay. There was nothing wrong with that. The problem was what happened to the proceeds of the deal? They didn't go where Rottenstein assumed they were going to go when they gave your client the money. Isn't that what happened? Well, that's what the government alleges what happens. But Rottenstein's statement was, Harris told me, along with his right-hand lady, everything was legal and above board and can't be turned against Rottenstein because Weinstein is just a consultant in this matter. Assuming the deal had gone down as advertised. But that's the point I was just talking about. Rottenstein was looking to Harris for an assurance that the deal was going to go down the way it was described to him. But for your client's conduct, it would have gone down the way it was advertised, right? But the problem is that how did it happen that Weinstein had the ability to do that? The way it happened is because... Because of the endorsement. That's your theory? Yeah. Otherwise, Rottenstein says, I wouldn't have given him the money. I know that Weinstein's under indictment already. I'm looking to you, Mr. Harris, to get on the bus. So Harris votes not for the deal you're saying, but Harris votes for the client. And was that voucher for your client that sealed the deal? That's what you're alleging? Yes. And that's what I think the 3,500 material established. That's why I think there's enough there that we don't have to wait for a habeas. The fact that your client, Royer, vouched for him, how would that create a conflict of interest down the road? If an attorney vouches for his client, vouches for his client's integrity, you're saying that later on creates a conflict of interest somehow? Well, if he's vouching, if he's... The question is, the indictment, the Weinstein indictments, I think both indictments, are replete with the fact that Weinstein used his lawyers to further his fraud, often knowingly. The question is... You have... Harris had to know that Weinstein would misappropriate the money or wanted him to do so, right? In order to make him a co-conspirator, but certainly it raises a shadow. Certainly there's an ethical issue. If he's making a representation, what was the basis for Mr. Harris's ability to make... But is there any evidence to show that Harris knew that Mr. Weinstein would misappropriate the money or wanted him to misappropriate the money? No, there's no evidence of that. But I don't think that's a determinative factor. Well, you're trying to say that this case is similar to the ZEP case, and in the ZEP case the attorney knew the things were wrong. There's no evidence here that Mr. Harris knew anything was wrong with respect to Mr. Weinstein's approach to Mr. Rottenstein. My recollection of ZEP was it was an issue of whether the drugs had been... who had flushed the drugs down the toilet. The attorney was in the house, the drugs were flushed down the toilet, and the attorney said, I didn't do it. Therefore, if there were only two people in the house, in effect, he was saying by implication that the other person did do it and it was used at trial. That's very different than what happened here. The attorney knew that the person had drugs and was flushing them down the toilet. Here, Mr. Harris did not necessarily... There's no evidence that we have that Mr. Harris knew that anything was, you know, not by the book. But the question is, did Mr. Harris have a basis for making the representations that he did make? Let me ask you this. I mean... He would if he didn't. That's not the issue. The issue is did he know that there was something wrong, not whether he had a basis to know everything was right. And that's what I think could be explored further at a hearing, but certainly on the bold assertions that are made by Rottenstein, Harris has reason to be concerned. What about this double jeopardy argument you're making? You have different dates of the offense. You have different victims. You have a different scheme, as it were, and you have different co-defendants. So why don't you help me out with this double jeopardy argument? I think, well, first of all, the different dates, as many courts have recognized, it's... It's just one of the several factors. More than that, the point is the court is not bound by what's essentially artificial pleading by the government. It's the government that makes the determination as to what dates we're going to charge. But the court in deciding this issue is not bound by that. So that's the first thing. As far as the overlap, obviously conspiracies, even the Weinstein 1 conspiracy, was an evolving conspiracy. There were people, you know, not all the co-conspirators were there at every time, but the mode was continuous between Weinstein 1 and Weinstein 2. It was the same MO in terms of using real estate deals to defraud investors. So this was all relevant conduct in the first indictment? Is that what you're talking about? It could have been. It could have been. And there is an overlap. Fred Todd, who's key to Weinstein 2, is... Rottenstein testified in the grand jury. He was the one who misrepresented to me the deal in Weinstein 1, this CRE in the Weinstein 2 indictment. That phone is off, but my computer doesn't know it. I'm sorry. It's in the phone of the computer. The plea agreement said that in Weinstein 1 that it went through from 04 to a certain date, I guess in 11 or whatever it was. And then the second, it also had an out for anything we did not know, we, the government, did not know at that time. And the government says it didn't know anything at that time, found out later on that there was additional things going on, including apparently while Mr. Weinstein was out on bail, is that correct? Is that what the allegation is? Yes. And why isn't there any conceivable modus operandi? Doing the same type of thing twice doesn't make double jeopardy. It has to be the same crime. This is like different people, maybe the same M.O., but different people, different amounts taken? It's more than just the same M.O. There is overlap in the participants. Some overlap. But that's, I think, all that's required. Obviously, within the Weinstein conspiracy itself, in the Weinstein 1 conspiracy. Wait a minute. If Weinstein 1 has Restrepo and McKee and Ambrow are defrauded, and Weinstein 2 is only Ambrow and Smith, you're telling me double jeopardy comes into play? If it's one continuous conspiracy, yes, if it's all. What court has ever said that? What court has ever said that? You're asking us to get, you know, reversed without even having, without, you know, was it grant, vacate, and remand? What court has ever said what you just said? I think that that's what the leotard factors look to. What court has ever said that the government here could not indict if there's other people involved in a fraud that involves, in my case, Ambrow, who was part of the first, and Smith, who was not part of the first. There's no remedy for Smith? Well, it depends when the conspiracy took place. Certainly. They're saying it took place after the plea agreement was entered into. And the plea agreement specifically marked out dates. This is from 04, this date, and they're saying in Weinstein 2 that it's after the second date. We cited a case, Gibson, which looked to the date of sentencing as the relevant cutoff for double jeopardy purposes. So I certainly would cite that, even as to if you look at the date of the plea. It's because here all of the conduct that was in the Weinstein 2 indictment, all of it, all the substantive acts, occurred before, prior to the plea. All of them occurred prior to the plea? All of the substantive acts, yes. Are you sure about that? Yes, I'm positive about that. There may have been the conspiracy extended in time. There was no money that was taken after the date of the plea. What some courts have said is, well, the government would then have to prove some act afterwards. Certainly Weinstein and his plea did not acknowledge anything after that. Thank you very much. Mr. Coyne, I know you want to make a very impressive argument, especially since Mr. Gross is observing. If you wanted to rest on your briefs, I'm not sure we would have questions about your strategy in doing that. Allow me at least to introduce myself to the court. Thank you for having us, Your Honor. Mark Coyne on behalf of the United States. And I will take my cue. We will rest on our briefs. Okay. I wasn't sure it was a cue, but I guess it was. Did you reserve me a bottle? I'm sorry. I did. Okay. How much time do you reserve? Two minutes. Okay. I'm going back up. We're anxious to hear from you. We didn't want the train of thought to be interrupted by anything that Mr. Coyne might throw at us. Also, what about the victims? Going back to the conspiracy overlap, the fact that you've got, I guess in the second conspiracy, a victim, principal victim in New Zealand. You're saying that's not really that relevant under the leotard factors? It doesn't play that heavily under the leotard factors? In the Weinstein one indictment, there were certainly victims that were in Israel. I think the reason why the government conceded that factor in the district is because, regardless of where the victims actually lived, the conduct took place in New York and New Jersey. All the representations by Weinstein were Mr. Chambers had come into the United States at that point, and the representations were all made in New York and New Jersey. And with respect to the other argument you're raising, the government's breach of the plea agreement, is it your position that this is a de facto immunity type situation, that he couldn't be charged for conduct the government knew about? Yes. Our interpretation of conduct means it's MO. MO, not specific acts. Right. And that's certainly what I think the record would establish the lawyers believe in advising him. We submitted an affidavit in the district court from Mr. Schoen. There was also Mr. Harris's notes. There was an affidavit from Mr. Weinstein. Now, all of that I think was sufficient to get a hearing before the district judge to explore this, but certainly there was enough in the record on all the issues that at least a hearing should have been warranted. And what's the end game? Suppose you get your hearing. Are you asking for a trial? Are you asking for a new plea? What are you looking for? We're asking to withdraw. Well, as to Weinstein 2, we're asking that the Weinstein 2 charges should be dismissed because they're barred by the plea agreement. But in terms of the Weinstein 1 and the Rule 11, we're asking to withdraw our plea, and if necessary, to go to trial, yes. Thank you very much. We'll take another under advisement.